## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>DBSI INC., *et al.*,[1]<br><br>                  Debtors. | Chapter 11<br><br>Case No. 08-12687 (PJW)<br><br>Jointly Administered |
| JAMES R. ZAZZALI, as Trustee for the Debtors' Jointly-Administered Chapter 11 Estates and/or as Litigation Trustee for the DBSI Estate Litigation Trust,<br><br>                  Plaintiff,<br><br>    v.<br><br>DBSI HOUSING - NEW HAMPSTEAD 2 and JOHN DOE 1-10,<br><br>                  Defendants. | Adversary Proceeding No. 10- _____. |

## COMPLAINT

James R. Zazzali, as trustee for the jointly-administered chapter 11 estates of DBSI Inc. ("DBSI") and certain of its affiliated debtors and Consolidated Non-Debtors[2] (collectively, the "Debtors") and/or as Litigation Trustee for the DBSI Estate Litigation Trust (hereafter, "Plaintiff"), by and through his undersigned attorneys, hereby alleges in support of this Complaint to avoid and recover certain transfers against DBSI Housing - New Hampstead 2 ("Defendant") that:

---

[1] The last four digits of DBSI Inc.'s federal tax identification number are 5037. The mailing address for DBSI Inc. is 12426 West Explorer Drive, Suite 220, Boise, Idaho 83713.

[2] The term Consolidated Non-Debtors is defined in the *Second Amended Joint Chapter 11 Plan of Liquidation filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* [Docket No. 5699] (the "Plan").

## NATURE OF COMPLAINT

1.      This Complaint seeks to avoid and recover from Defendant, or from any other person or entity for whose benefit the transfers were made, all fraudulent transfers of property, and to or for the benefit of Defendant or defendants John Doe 1-10, from an account owned by one or more of the Debtors and/or any applicable additional Debtor(s) and/or the affiliated "Consolidated Non-Debtor(s)" (as that term is defined in the Plan) (collectively, the "Transferor") during the four year period prior to the filing of the Debtors' bankruptcy petitions pursuant to 11 U.S.C. §§ 544, 548 and 550 and/or applicable state law.  Subject to further discovery, proof, and/or affirmative defenses that may be asserted by Defendant in response to the Complaint, Plaintiff also seeks: (i) to recover any unauthorized post-petition transfers, including any transfers on account of pre-petition debt that cleared post-petition, pursuant to 11 U.S.C. § 549, and (ii) any preferential transfers that the Debtors may have made to the Defendant pursuant to 11 U.S.C. § 547.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this adversary proceeding because it arises under title 11, or arises in or relates to a case under title 11 now pending in the United States Bankruptcy Court for the District of Delaware (the "Court"), pursuant to 28 U.S.C. §§ 157 and 1334(b).

3.      The bases for the relief requested herein are 11 U.S.C. §§ 502, 544, 547, 548, 549, 550, and 551, Federal Rules of Bankruptcy Procedure 7001 and 7003, applicable state law to avoid and recover transfers of certain property interests of the Debtors to the Defendants.

4.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F), (H), and (O).

5.     Venue is proper in the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## BACKGROUND AND PARTIES

6.     On November 6, 2008 and various dates thereafter (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under title 11, chapter 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").  Since the Petition Date, certain of the Debtors' cases have been converted to cases administered under chapter 7 of the Bankruptcy Code.  The Debtors' cases that are currently administered under chapter 11 are jointly administered pursuant to Orders of the Court.

7.     On November 21, 2008, the Office of the United States Trustee for Region Three (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee").

8.     On April 3, 2009, the U.S. Trustee filed her Notice of Appointment of Examiner wherein she notified Joshua R. Hochberg (the "Examiner") of his appointment to serve as Examiner, pending approval of the Court.  On April 14, 2009, the Court entered its Order Approving Appointment of Examiner [Docket No. 3308].  The Examiner issued his First Interim Report on August 3, 2009 [Docket No. 4159] and his Final Report on October 19, 2009 [Docket No. 4544] ("Final Report").

9.     On August 17, 2010, Plaintiff and the Committee filed their Second Amended Joint Chapter 11 Plan of Liquidation filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors (the "Plan"), along with related documents [Docket Nos. 5699 through 5703].

10.     Pursuant to the Court's *Findings of Fact, Conclusions of Law and Order Confirming Second Amended Joint Chapter 11 Plan of Liquidation* entered on October 26, 2010 [Docket No. 5924](the "Confirmation Order"), the DBSI Estate Litigation Trust (as defined in the Plan) was established, which trust will become effective on the effective date of the Plan (the "Effective Date").  Pursuant to the Plan, the Confirmation Order and the DBSI Estate Litigation Trust Agreement (as defined in the Plan), Plaintiff was appointed as the DBSI Estate Litigation Trustee and granted the right to prosecute and settle any and all Estate Causes of Action (as defined in the Plan), including the causes of action asserted in this Complaint.

11.     Plaintiff is the duly-appointed, qualified, and acting trustee for the Debtors' chapter 11 estates pursuant to section 1104(a) of the Bankruptcy Code and the Court's Orders appointing the Trustee dated August 14, 2009 and September 11, 2009.  Plaintiff is also the duly-appointed, qualified, and acting trustee for the DBSI Estate Litigation Trust pursuant to section 1123 of the Bankruptcy Code and the Court's Confirmation Order.

12.     Upon information and belief, Defendant  is a business association or individual with a principal place of business or domicile in Boise, ID   83713.

13.     Defendants John Doe 1-10 are persons for whose benefit Defendant received the transfers at issue in this Complaint and/or are the immediate or mediate transferee(s) of the initial transfer(s) at issue in this Complaint.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### A.  The DBSI Business Model

14.     Beginning in the early 2000s and continuing through October 2008, the Debtors were engaged in a complex series of real estate transactions, development projects, and related investment schemes whereby:  (1) the Debtors issued notes, bonds, and other investments to raise capital from outside investors; (2) formed hundreds of special purpose entities ("SPEs") to purchase, develop, own, and operate income producing properties and related enterprises; (3) invested in a series of technology businesses (the "Technology Companies," including Stellar Technologies LLC ("Stellar")); and (4) ultimately, diverted hundreds of millions of dollars to or for the benefit of the Debtors' principals, other insiders, and the Technology Companies.

15.     Notably, a primary investment used by the Debtors in furtherance of this enterprise was known as a tenant-in-common (or "TIC") investment, whereby DBSI, debtor FOR 1031 LLC ("FOR 1031"), or one of their wholly-owned SPEs acquired real property improved by commercial or residential buildings.  The Debtors would then market and sell fractional interests in an SPE, or "TIC Property," to TIC investors.  Offering documents reflect that the marketability of the TIC investments rested on (i) their qualification under Internal Revenue Code § 1031 as a tax-minimization device for sheltering capital gains in commercial real estate, and (ii) DBSI's guaranty of a steady return on investment.

16.     For many years, DBSI sold its TIC investments through both a securities channel and a real estate channel.  In the securities channel, an affiliate of DBSI known as DBSI Securities Corporation ("DBSI Securities"), through a network of registered broker-dealers, marketed and sold the TIC investments on a wholesale basis to various broker-dealers around the

United States. The broker-dealers would, in turn, sell the TIC interests to the investing public and receive a commission on those sales.

17.     Beginning in 2003, DBSI began marketing and selling the TIC interests through FOR 1031. FOR 1031 marketed and sold the TIC interests as real estate rather than as a security. By selling TIC investments through the real estate channel, DBSI was able to circumvent the strict regulatory scheme governing the marketing and sale of TIC investments as securities. FOR 1031 thus used real estate brokers and agents to sell TIC interests to the public, with the brokers and agents receiving a commission on those sales. DBSI and FOR 1031 sold TIC investments as real estate investments until October 2007. DBSI ceased selling TIC investments through its real estate channel because it was being pressured by the U.S. Securities and Exchange Commission over whether such sales constituted the sale of securities.

18.     Simultaneously with the sale of TIC interests in a particular TIC Property, DBSI would form another SPE to act as the "Masterlessee" of the TIC Property. The TIC investors leased the TIC Property to the Masterlessee through a master lease agreement (the "Masterlease"), and the Masterlessee would then sub-lease the TIC Property to third parties.

19.     The Masterlessee collected rent from the third-party sub-tenants and paid, among other things, the operating expenses associated with the TIC Property, rent to the TIC investors, and a management fee to one of the Debtors. DBSI guaranteed substantially all of the Masterlessee's obligations under a Masterlease.

### B. **The Transferors' Fraudulent Scheme**

20.     The only operations of DBSI that generated positive cash flow were the sale of TIC interests and the sale of the note, bond and fund investments.  Marketing, transactional and organizational costs in the TIC syndication business prevented it from generating sufficient profit to support the DBSI enterprise.  At some point in or after 2004, the DBSI enterprise took on the characteristics of a Ponzi scheme, in which the guaranteed returns to the old investors could only be satisfied by the flow of funds from the new investors.  To that end, corporate formalities of numerous DBSI entities were ignored.  Funds were transferred without consideration or documentation.  Money was pulled from entities that had cash at a particular moment and transferred to entities that needed cash at that moment.  Real estate valuations of properties did not reflect actual value but were designed to comply with loan-to-value ratio requirements of the respective DBSI entities issuing notes and bonds.  That practice permitted inter-entity borrowing in an amount that would satisfy the cash needs of the day.  By generating a continuing influx of cash from new investors through serial bond, note and fund offerings and sales of TIC investments in TIC Properties, the Debtors were able to create and promote the false impression of financial strength and make consistent payments to investors, notwithstanding that the Debtors' were insolvent at the time.

21.     During the four-year period preceding the Petition Date (the "Four Year Period"), the Debtors were facing severe cash shortages and were largely dependent on new investor money to provide cash for operations and to fund payments to prior investors.

22.     Consistent with an entity that was engaged in such a fraudulent scheme, the assets of DBSI and its affiliates were hopelessly commingled.  Monies were pooled and swept from one entity and account to another without regard for the source of the funds or any legal restrictions

that may have been in place on the use of those funds.  Large sums of money and debt were transferred without adequate documentation.  Transactions were routinely not at arm's length, and no attempt was made to make exchanges for equivalent value.  Various DBSI entities were utilized to funnel money to insiders and to capture tax losses for the insiders' benefit and to the detriment of the DBSI enterprise.

23.     The cash in DBSI's operating accounts was a mélange of TIC sales proceeds, "Accountable Reserves," funds in transit to or from the "Funding Entities" (that is, the various DBSI entities responsible for the sale of TIC interests and the sale of the note, bond and fund investments), tenant rents and "float" (*i.e.*, checks and other disbursements that had been written and transmitted but not yet presented for payment).  Very frequently, DBSI's projected consolidated commingled cash showed a negative book balance, after "float" was taken into account.  There were no other significant sources of cash for the enterprise.

24.     DBSI and its principals freely commingled and transferred funds and debt. Money was constantly deposited and withdrawn in the central DBSI operating accounts to and from dozens of sources.  Commingled funds were used to meet obligations and expenses as they arose without regard for the source of the funds or the entity liable for the debts paid.

25.     TIC interests in a TIC Property were often sold to investors at substantial mark-ups over the price at which an SPE had acquired the TIC Property, yet no value had been added to justify the mark-up.  In addition to the tax benefit that the TIC investors found attractive, DBSI represented and guaranteed to TIC investors that the properties would generate a generous and steady stream of revenue through rental income.

26.     DBSI raised cash through the issuance of notes that restricted the use of the cash to financing real estate purchases, but instead improperly used the note proceeds for its own general corporate purposes, including servicing the debt obligations it owed to earlier investors.

27.     Starting around 2005, DBSI began to designate a portion of the proceeds received from TIC investors as "Accountable Reserves," expressly defined by offering documents as monies dedicated to capital improvements and other expenditures necessary to maintain and develop the TIC Property purchased.  Not only were investors told that Accountable Reserves would be used solely for property-specific purposes, they were told that any portion of the Accountable Reserves that were not used for property-specific purposes would be returned to them.

28.     The Accountable Reserve on any given TIC Property was generally equal to 5% or more of the purchase price of the TIC Property.  Over the course of DBSI's practice of requiring TIC investors to contribute Accountable Reserve funds as part of their investment, DBSI amassed nearly $100 million in cash.

29.     As was otherwise the practice at DBSI, funds obtained from TIC investors under the guise of the Accountable Reserve design were freely commingled with other DBSI funds and used by DBSI and other DBSI entities for general corporate and non-TIC related purposes. These funds were kept in general operating accounts and other cash accounts of DBSI.  The commingled accounts also often contained proceeds of loans from other Funding Entities as cash was moved through to buy real estate or meet operating needs.

30.     Some $82 million of the Accountable Reserves were spent for unauthorized purposes.

## C. **The Transferors' Insolvency**

31.     The Debtors were insolvent using traditional accounting standards and tests.

32.     DBSI was also insolvent as a matter of law by virtue of their fraudulent scheme.

33.     The Debtors were able to mask their insolvency on their unaudited consolidated balance sheets during the Four Year Period by failing to follow Generally Accepted Accounting Principles ("GAAP").  In his Final Report, the Examiner concluded that DBSI's unaudited financial statements were not compliant with GAAP.

34.     By failing to follow GAAP, the Debtors issued materially inaccurate financial statements during the Four Year Period that permitted DBSI to conceal its insolvency from the investing public.

35.     During the Four Year Period:

a)     DBSI disbursed funds on a monthly basis to support TIC Properties that were failing to generate sufficient operating income to satisfy their rent and loan obligations to TIC investors.  In short, DBSI's guaranties of the Masterlessees' obligations were no longer contingent.  DBSI was covering all of the TIC Properties' cash shortfalls.

b)     DBSI also guaranteed the repayment of principal and interest in the amount of approximately $300,000,000 in bond and note issuances.  This guaranty liability was not fully recognized, recorded or disclosed by DBSI in its financial statements.

c)     DBSI posted receivables due from its affiliates at full value without testing those receivables for impairment, even though many of the borrowing affiliates were known to be insolvent and known to be unable to repay the amounts due.  DBSI should have—but failed to—establish off-setting reserves for the value of the impaired receivables due from its affiliates.

d)     DBSI made no effort to accurately reflect the near total impairment of its investments in the Technology Companies, which as recently as June 30, 2008, DBSI carried on its books and records at $235,000,000.

e)     The Examiner found that DBSI's financial statements were misleading because they netted as a single line item receivables due from, and payables due to, affiliated entities, including the bond and note entities.  According to the Examiner:

> DBSI Inc.'s balance sheet for the period ended December 31, 2007 presented, under current assets, a "Net receivable from affiliates" of $1.4 million and nothing for liabilities owed to the bond and note holders.  Yet, the amount due at that time to the bond and note holders was approximately $194 million.
>
> The netting of receivables and payables was misleading because the payables and receivables being netted were two very different things.  The payables consisted of hard debt owed to bond and note holders with a defined maturity date.  On the other hand, the receivables from the Technology Companies were likely uncollectible debts that neither Stellar nor the Technology Companies could pay off.

f)     DBSI carried long-term assets and inventory (real property) at cost, without regard to realizable market value and without establishing off-setting reserves to account for the difference between cost and market value.  Notably, this was done at a time when real estate values were declining.

36.     DBSI's management of its bank account structure also evidences an enterprise that was hopelessly insolvent.

37.     Throughout its history, the DBSI entities maintained hundreds of bank accounts. The accounts were designated for various purposes, including liquid reserve accounts, escrow accounts, operating accounts and individual corporate accounts.

38.     A number of the DBSI accounts were zero balance accounts ("ZBA"), in that at the end of each day, the monies deposited in those accounts were swept up into an interest bearing liquid reserve account.  Master Leaseco accounts were typically ZBAs.

39.     To the extent checks or other charges drawn for payment on a ZBA were presented, the ZBA would be reimbursed from one of the Debtors' liquid reserve accounts on an automatic basis.  Expenses presented to the ZBAs were monitored so that the liquid reserve accounts could be funded as needed.

40.     DBSI monitored and managed its cash in a globally-consolidated, commingled manner.  If one of the DBSI entities needed funds to meet operating expenses, purchase property, make payroll, make distributions to Insiders, satisfy third-party debt obligations or meet other cash needs, funds would be transferred from one entity to another where needed, often automatically.  These transactions were not the result of an arms-length transaction between unrelated parties.

41.     DBSI routinely moved money wherever it was needed without regard for the source of the funds.  The source of funds varied from day to day without regard for where the funds originated.

42.     By late 2006, cash shortages were such an acute problem that management was consumed by the machinations of managing and obtaining cash.  From early 2005, management met frequently to address cash-flow needs.  These meetings were typically attended by Douglas Swenson, Gary Bringhurst, Matthew Duckett or Paris Cole, Thomas Var Reeve, David Swenson, and Jeremy Swenson.  Duckett communicated the decisions made at the cash meetings to the accounting staff so they could execute them.

43. In preparation for these meetings, a "cash sheet" was prepared that summarized all the sources and uses of cash within the DBSI consolidated enterprise and projected where cash balances would be over an ensuing 90-day period. But the focus of the cash meetings was much shorter term because, for a large number of the time periods, despite massive flows of cash in and out of its accounts, a snapshot on any given day would show either a very meager cash balance or a collective deficit These meager balances and constant need to feed cash to meet the onerous obligations DBSI had incurred required an exceptional level of attention to maintain liquidity by moving money to wherever it was needed.

44. At the end of September 2008, the Debtors ceased making (i) all TIC rent payments under numerous Masterleases, and (ii) all interest payments due investors in certain of the Debtors' note and bond funds. This freed up approximately $10 million in cash for the months of October and November 2008 and facilitated the Debtors' ability to make payments to certain preferred creditors during the Preference Period (as defined below).

## C.  The Fraudulent Transfers to the Defendants

45. During the two year period before the Petition Date, that is, November 10, 2006 through and including November 10, 2008 (the "Two Year Period"), the Transferors made one or more transfers of an interest in the Debtors' property to, or for the benefit of, the Defendants (the "Two Year Transfers"). A schedule identifying each Two Year Transfer, including the identity of the Transferor and of the Defendant transferee, is attached hereto as Exhibit A and is incorporated herein by reference.

46. During the four year period before the Petition Date, that is, from November 10, 2004 through and including November 10, 2008 (the "Four Year Period"), the Transferor made one or more transfers of an interest in the Debtors' property to, or for the benefit of, Defendant

(the "Four Year Transfers").  A schedule identifying each Four Year Transfer, including the identity of the Transferor and of the Defendant transferee, is also included in Exhibit A and is incorporated herein by reference.

### FIRST CAUSE OF ACTION
### AVOIDANCE AND RECOVERY OF THE TWO YEAR TRANSFERS
### AS ACTUAL FRAUDULENT TRANSFERS PURSUANT TO
### 11 U.S.C. §§ 548(A)(1)(A), 550(A), AND 551

47.     Plaintiffs reassert all of the allegations in the foregoing paragraphs of this Complaint as if more fully set forth herein.

48.     The Two Year Transfers were made with the Debtors' actual intent to hinder, delay, or defraud creditors of the Transferors because the Two Year Transfers were made in connection with and in furtherance of the Debtors' on-going fraudulent scheme.

49.     The Transferors knew of the Debtors' dependence on new investor money to provide cash for operations and to fund payments to prior investors.

50.     The Transferors knew:  (i) that the Transferors' assets were impaired; (ii) that the Transferors failed to record appropriate reserves for such impairment; and (iii) that their assets were therefore overvalued.

51.     The Transferors knew that their real property portfolio barely broke even or lost money because the income from the properties was insufficient to cover the combined burdens of debt service and guaranteed TIC investor payments.

52.     As of the date hereof, Defendants and defendants John Doe 1-10 have not returned any of the Two Year Transfers to the Debtors' estates.

53.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550, and 551 of the Bankruptcy Code, Plaintiff is entitled to a judgment:  (i) avoiding and preserving the Two Year Transfers; (ii) directing that the Two Year Transfers be set aside; and (iii) recovering the Two Year Transfers, or the value thereof, from the Defendants for the benefit of the Debtors' estates.

**SECOND CAUSE OF ACTION**
**AVOIDANCE AND RECOVERY OF CONSTRUCTIVELY FRAUDULENT**
**TRANSFERS PURSUANT TO 11 U.S.C. §§ 548(A)(1)(B), 550(A) AND 551**

54.     Plaintiff repeats and re-alleges the allegations of the foregoing paragraphs of this Complaint as if set forth at length herein.

55.     The Transferors were:  (i) insolvent when the Two Year Transfers were made, or, in the alternative, became insolvent as a result of the Two Year Transfers; (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which the property remaining with the Transferors after the Two Year Transfers were made constituted unreasonably small capital; or, alternatively, (iii) at the time the Two Year Transfers were made, the Transferors intended to incur, or believed that they would incur, debts that would be beyond the Transferors' ability to pay as they matured.

56.     The Transferors received less than reasonably equivalent value in exchange for the Two Year Transfers.

57.     Each of Defendants and defendants John Doe 1-10 are either the initial transferee of the Two Year Transfers or the immediate or mediate transferee of such initial transferee or are the persons for whose benefit the Two Year Transfers were made.

58.     As of the date hereof, Defendants and defendants John Doe 1-10 have not returned any of the Two Year Transfers to the Debtors' estates.

59.     As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550, and 551 of the Bankruptcy Code, Plaintiff is entitled to a judgment:  (i) avoiding and preserving the Two Year Transfers; (ii) directing that the Two Year Transfers be set aside; and (iii) recovering the Two Year Transfers, or the value thereof, from the Defendant) for the benefit of the Debtors' estates.

**THIRD CAUSE OF ACTION**
**AVOIDANCE AND RECOVERY OF THE FOUR YEAR TRANSFERS AS**
**ACTUAL FRAUDULENT TRANSFERS PURSUANT TO**
**IDAHO CODE ANN. §§ 55-913(A), 55-916, AND 55-917**

60.     Plaintiffs reassert all of the allegations in the foregoing paragraphs of this Complaint as if more fully set forth herein.

61.     The Four Year Transfers were made with the Debtors' actual intent to hinder, delay, or defraud creditors of the Transferors because the Four Year Transfers were made in connection with and in furtherance of the Debtors' on-going fraudulent scheme.

62.     The Transferors knew that their real property portfolio barely broke even or lost money because the income from the properties was insufficient to cover the combined burdens of debt service and guaranteed TIC investor payments.

63.     The Transferors knew that their management was closely monitoring the Debtors' cash needs and that certain members of senior management and various accounting personnel were meeting weekly to review the cash obligations of the DBSI enterprise and identifying sources and uses of cash to meet near-term funding requirements.

64.     The Transferors knew of the Debtors' dependence on new investor money to provide cash for its operations and to fund payments to prior investors.

65.     The Transferors knew: (i) that the Transferors' assets were impaired; (ii) that the Transferors failed to record appropriate reserves for such impairment; and (iii) that their assets were therefore overvalued.

66.     The Four Year Transfers were fraudulent transfers in violation of Idaho Code Ann. §§ 55-913(a), 55-916, and 55-917.

67.     As of the date hereof, Defendants and defendants John Doe 1-10 have not returned any of the Four Year Transfers to the Debtors' estates.

68.     By reason of the foregoing, Plaintiff is entitled to a judgment pursuant to Idaho Code Ann. §§ 55-913(a), 55-916, and 55-917 and Bankruptcy Code §§ 544(b), 550, and 551: (i) avoiding and preserving the Four Year Transfers; (ii) directing that the Four Year Transfers be set aside; and (iii) recovering the Four Year Transfers, or the value thereof, from Defendants for the benefit of the Debtors' estates.

**FOURTH CAUSE OF ACTION**
**AVOIDANCE AND RECOVERY OF THE FOUR YEAR TRANSFERS AS**
**CONSTRUCTIVELY FRAUDULENT TRANSFERS PURSUANT TO IDAHO CODE**
**ANN. §§ 55-913(B), 55-916, AND 55-917 AND**
**11 U.S.C. §§ 544(B), 550, AND 551**

69.     Plaintiff repeats and re-alleges all of the allegations in the foregoing paragraphs of this Complaint as if more fully set forth herein.

70.     The Transferors were insolvent as that term is defined under Idaho Code Ann. § 55-912 during the Four Year Period.

71. The Transferors received less than reasonably equivalent value in exchange for the Four Year Transfers.

72. The Four Year Transfers were made while the Transferors were engaged, or were about to engage, in a business or a transaction for which the Transferors' remaining assets were unreasonably small in relation to their businesses or transactions.

73. The Transferors reasonably should have believed that they would incur debts beyond their ability to pay as they became due as a result of the Four Year Transfers.

74. An unsecured creditor existed at the time of or after the Four Year Transfers who holds a claim that is allowable under Bankruptcy Code section 502 and who, under non-bankruptcy law, could have avoided the Four Year Transfers, at least in part.

75. The Four Year Transfers were fraudulent transfers in violation of Idaho Code Ann. § 55-913(b) as to present and future creditors.

76. Each of Defendants and defendants John Doe 1-10 are either the initial transferee of the Four Year Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Four Year Transfers were made.

77. As of the date hereof, Defendants and defendants John Doe 1-10 have not returned any of the Four Year Transfers to the Debtors' estates.

78. By reason of the foregoing, Plaintiff is entitled to a judgment pursuant to Idaho Code Ann. §§ 55-913(b), 55-916, and 55-917 and Bankruptcy Code §§ 544(b), 550, and 551: (i) avoiding and preserving the Four Year Transfers; (ii) directing that the Four Year Transfers be set aside; and (iii) recovering the Four Year Transfers, or the value thereof, from Defendant(s) for the benefit of the Debtors' estates.

## FIFTH CAUSE OF ACTION
## AVOIDANCE AND RECOVERY OF THE FOUR YEAR TRANSFERS
## AS CONSTRUCTIVELY FRAUDULENT TRANSFERS
## PURSUANT TO IDAHO CODE ANN. §§ 55-914(1), 55-916, AND 55-917
## AND 11 U.S.C. §§ 544(B), 550, AND 551

79.     Plaintiff repeats and re-alleges all of the allegations in the foregoing paragraphs of this Complaint as if more fully set forth herein.

80.     The Transferors were insolvent as that term is defined under Idaho Code Ann. § 55-912 during the Four Year Period and at the time the Four Year Transfers were made or became insolvent as a result of the Four Year Transfers.

81.     The Four Year Transfers were made by the Transferors without receiving reasonably equivalent value in exchange for the transfers or obligations.

82.     An unsecured creditor existed at the time of the Four Year Transfers who holds a claim that is allowable under Bankruptcy Code section 502 and who, under non-bankruptcy law, could have avoided the transfers, at least in part.

83.     The Four Year Transfers were fraudulent transfers in violation of Idaho Code Ann. § 55-914(1).

84.     Each of Defendants and defendants John Doe 1-10 are the initial transferee of the Four Year Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Four Year Transfers were made.

85.     As of the date hereof, Defendants and defendants John Doe 1-10 have not returned any of the Four Year Transfers to the Debtors' estates.

86.     By reason of the foregoing, Plaintiff is entitled to a judgment pursuant to Idaho Code Ann. §§ 55-914(1), 55-916 and 55-917 and Bankruptcy Code §§ 544(b), 550, and 551:

(i) avoiding and preserving the Four Year Transfers; (ii) directing that the Four Year Transfers be set aside; and (iii) recovering the Four Year Transfers, or the value thereof, from Defendants for the benefit of the Debtors' estates.

## SIXTH CAUSE OF ACTION
## TRANSFERS IN FRAUD OF CREDITORS
## PURSUANT TO IDAHO CODE ANN. § 55-906 AND
## 11 U.S.C. §§ 544(B), 550, AND 551

87.     Plaintiffs reassert all of the allegations in the foregoing paragraphs of this Complaint as if more fully set forth herein.

88.     Idaho Code Ann. § 55-906 provides that:

> Every transfer of property, or charge thereon made, every obligation incurred, and every judicial proceeding taken, with intent to delay or defraud any creditor or other person of his demand, is void against all creditors of the debtor and their successors in interest, and against any person upon whom the estate of the debtor devolves in trust for the benefit of others than the debtor.

89.     The Transferors knew that their real property portfolio barely broke even or lost money because the income from the properties was insufficient to cover the combined burdens of debt service and guaranteed TIC investor payments.

90.     The Transferors knew that their management was closely monitoring the Debtors' cash needs and that certain members of senior management and various accounting personnel were meeting weekly to review the cash obligations of the DBSI enterprise and identifying sources and uses of cash to meet near-term funding requirements.

91.     The Transferors knew of the Debtors' dependence on new investor money to provide cash for its operations and to fund payments to prior investors.

92.    The Four Year Transfers were made with the actual intent to hinder, delay, or defraud creditors of the Transferors because the Four Year Transfers were made in connection with and in furtherance of the Debtors' on-going fraudulent scheme.

93.    The Transferors knew:  (i) that the Transferors' assets were impaired; (ii) that the Transferors failed to record appropriate reserves for such impairment; and (iii) that the assets were therefore overvalued.

94.    The Transferors knew that at the time the Four Year Transfers were made that the Transferors were insolvent.

95.    The Four Year Transfers were made in violation of Idaho Code Ann. § 55-906.

96.    As of the date hereof, Defendants and defendants John Doe 1-10 have not returned any of the Four Year Transfers to the Debtors' estates.

97.    By reason of the foregoing, Plaintiff is entitled to a judgment pursuant to Idaho Code Ann. §§ 55-906 and Bankruptcy Code §§ 544(b), 550, and 551:  (i) avoiding and preserving the Four Year Transfers; (ii) directing that the Four Year Transfers be set aside; and (iii) recovering the Four Year Transfers, or the value thereof, from Defendants for the benefit of the Debtors' estates.

**SEVENTH CAUSE OF ACTION**
**RECOVERY FROM DEFENDANT FOR UNJUST ENRICHMENT**

98.    Plaintiffs reassert all of the allegations in the foregoing paragraphs of this Complaint as if more fully set forth herein.

99.    Defendants and/or defendants John Doe 1-10 were enriched as a result of receiving the Two Year Transfers and the Four Year Transfers described in this Complaint by receiving something of value that belonged to Plaintiff.

100.    These enrichments violate equity and good conscience.

101.    These enrichments did not result from enforceable agreements between Plaintiff and Defendants.

102.    By reason of the forgoing, Defendants and/or defendants John Doe 1-10 should be compelled by this Court to make restitution to Plaintiff in the amount of the Two Year Transfers and the Four Year Transfers.

## EIGHTH CAUSE OF ACTION
## PREFERENTIAL TRANSFERS - 11 U.S.C. §§ 547, 550, AND 551

103.    Plaintiff pleads this Eighth Cause of Action in the alternative and repeats and re-alleges all of the allegations in the foregoing paragraphs in this Complaint as if more fully set forth herein.

104.    Upon information and belief, during the Preference Period, the Debtors continued to operate their business affairs, including the transfer of property either by checks, cashiers checks, wire transfers, or otherwise to certain transferees, including Defendants.

105.    Plaintiff is seeking to avoid all of the preferential transfers made by the Transferors to Defendants during the Preference Period.

106.    Within the ninety day period before the Petition Date, *i.e.,* from August 12, 2008 through and including November 9, 2008 (the "Preference Period"), the Transferors made one or more transfers of an interest in property to, or for the benefit of, Defendants and/or defendants John Doe 1-10.  A schedule identifying such transfers is also included in Exhibit A and incorporated herein by reference.

107.    The transfers on Exhibit A are transfers made to Defendants by the Transferors during the Preference Period.  All such transfers made by the Transferors of an interest in

property to or for the benefit of Defendants during the Preference Period are collectively referred to herein as the "Preferential Transfers."

108. The Transferors made the Preferential Transfers to, or for the benefit of, Defendants.

109. Defendants were creditors (within the meaning of section 101(10) of the Bankruptcy Code) of one or more of the Debtors at the time the Preferential Transfers were made, or were acting on behalf of defendants John Doe 1-10 in receiving the Preferential Transfers.

110. At the time of each of the Preferential Transfers, Defendants had a right to payment on account of one or more antecedent debts owed by one or more of the Debtors to Defendants and/or defendants John Doe 1-10.

111. The Preferential Transfers were to or for the benefit of a creditor within the meaning of section 547(b)(1) of the Bankruptcy Code because the Preferential Transfers either reduced or fully satisfied an antecedent debt then owed by one or more of the Debtors to Defendants.

112. The Transferors were insolvent at all times during the Preference Period. Plaintiff is entitled to a presumption of insolvency during the Preference Period for the Preferential Transfers pursuant to section 547(f) of the Bankruptcy Code.

113. As a result of the Preferential Transfers, Defendants received more than they would have received if: (i) the Debtors' cases were administered under chapter 7 of the Bankruptcy Code; (ii) the Transfers had not been made; and (iii) Defendants received payment of their respective debts to the extent provided by the provisions of the Bankruptcy Code.

114.    Each of Defendants and defendants John Doe 1-10 are either the initial transferee of the Preferential Transfers or the immediate or mediate transferees of such initial transferee or are the persons for whose benefit the Preferential Transfers were made.

115.    As of the date hereof, Defendants and defendants John Doe 1-10 have not returned any of the Preferential Transfers to the Debtors' estates.

116.    As a result of the foregoing, pursuant to section 547(b), 550, and 551 of the Bankruptcy Code, Plaintiff is entitled to a judgment:  (i) avoiding and preserving the Preferential Transfers; (ii) directing that the Preferential Transfers be set aside; and (iii) recovering the Preferential Transfers, or the value thereof, from the Defendants for the benefit of the Debtors' estates.

### NINTH CAUSE OF ACTION
### POST-PETITION TRANSFERS - 11 U.S.C. §§ 549(A), 550, AND 551

117.    Plaintiff pleads this Tenth Cause of Action in the alternative and repeats and re-alleges all of the allegations in the foregoing paragraphs of this Complaint as if more fully set forth herein.

118.    Plaintiff brings this cause of action in the event that Plaintiff learns through discovery or otherwise that Defendants received one or more unauthorized post-petition transfers of an interest of the Debtors in property that is avoidable pursuant to section 549 of the Bankruptcy Code ("Post-Petition Transfers").

119.    Each of the Post-Petition Transfers, if any, occurred after the applicable Debtors' Petition Date.

120. Each of the Post-Petition Transfers, if any, was authorized only under sections 303(f) or 542(c) of the Bankruptcy Code; or were not authorized under the Bankruptcy Code or the Court.

121. Each of Defendants and defendants John Doe 1-10 are either the initial transferee of the Post-Petition Transfers, if any, or the immediate or mediate transferee of such initial transferee or are the persons for whose benefit the Post-Petition Transfers were made.

122. As of the date hereof, Defendants and defendants John Doe 1-10 have not returned any of the Post-Petition Transfers, if any were made, to the Debtors' estates.

123. As a result of the foregoing, pursuant to sections 549(a), 550 and 551 of the Bankruptcy Code, Plaintiff is entitled to a judgment: (i) avoiding and preserving the Post-Petition Transfers, if any; (ii) directing that the Post-Petition Transfers, if any, be set aside; and (iii) recovering the Post-Petition Transfers, if any, or the value thereof, from the Defendants for the benefit of the Debtors' estates.

## TENTH CAUSE OF ACTION
## DISALLOWANCE OF ALL CLAIMS - 11 U.S.C. § 502

124. Plaintiff repeats and re-alleges the allegations of the foregoing paragraphs of this Complaint as if set forth at length herein.

125. Each Defendant is an entity from which property is recoverable under section 550 of the Bankruptcy Code and is a transferee of avoidable transfers under sections 544, 547, 548, and/or 549 of the Bankruptcy Code.

126. Each Defendant has not paid the amounts of the Two-Year Transfers, the Four Year Transfers, the Preferential Transfers, and the Post-Petition Transfers (collectively, the

"Transfers"), or turned over such property, for which each Defendant is liable under section 550 of the Bankruptcy Code.

127.    As a result of the foregoing, pursuant to section 502(d) of the Bankruptcy Code, any and all claims of Defendants against the Debtors' estates must be disallowed until such time as Defendants pay to Plaintiff an amount equal to the aggregate amount of the Transfers, together with interest thereon and costs of suit.

128.    To the extent any claim of Defendants against the Debtors has been allowed prior to the filing of this Complaint, cause exists for reconsideration of the claim pursuant to section 502(j) of the Bankruptcy Code, and Plaintiff is authorized to file a motion for reconsideration of such allowance.

## <u>RESERVATION OF RIGHTS</u>

129.    During the course of this adversary proceeding, Plaintiff may learn through discovery or otherwise of additional transfers made by the Debtors to, or for the benefit of, Defendants and/or defendants John Doe 1-10 that were unknown to Plaintiff as of the date of the Complaint (the "Additional Transfers").

130.    Plaintiff intends to avoid and recover all transfers made by the Debtors of an interest of the Debtors in property and to or for the benefit of Defendants or any other transferee. Plaintiff reserves its right to supplement and amend the allegations contained in this Complaint, including, but not limited to, the right to (i) allege further information regarding the Transfers, (ii) allege Additional Transfers, (iii) make modifications of and/or revision to Defendants or defendants John Doe 1-10's name(s), (iv) allege additional defendants, and/or (v) allege additional causes of action arising under sections 542, 544, 545, 547, 548 and 549 of the Bankruptcy Code (collectively, the "Amendments"), that may become known to Plaintiff at any

time during this adversary proceeding through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

131.    To the extent that Defendants and/or defendants John Doe 1-10 have filed a proof of claim or have a claim listed on the Debtors' schedules as undisputed, liquidated, and not contingent, or have otherwise requested payment from the Debtors' or their chapter 11 estates (collectively, the "Claims"), this Complaint is not intended to be, nor should it be construed as, a waiver of Plaintiff's right to object to such Claims for any reason including, but not limited to, section 502 of the Bankruptcy Code, and all such rights are expressly reserved.  Notwithstanding this reservation of rights, certain relief pursuant to section 502(d) of the Bankruptcy Code is sought by this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter relief and judgment in his favor and against Defendants and defendants John Doe 1-10 as follows:

a)    declaring that the Two Year Transfers and the Four Year Transfers are avoided and set aside as fraudulent transfers pursuant to sections 544 and 548 of the Bankruptcy Code and applicable state law;

b)    declaring that the Transfers identified herein (and any other transfers from the Debtors to the Defendant during the Preference Period that discovery may reveal), to the extent that they are avoidable pursuant to section 547 of the Bankruptcy Code, are avoided and set aside as preferences pursuant to section 547 of the Bankruptcy Code;

c)    declaring that the Post-Petition Transfers (and any other post-petition transfers from the Transferors to Defendants subsequent to the Petition Date that discovery may

reveal) are avoided and set aside as unauthorized Post-Petition Transfers pursuant to section 549 of the Bankruptcy Code;

        d)     directing and ordering that any Transfers avoided pursuant to sections 544, 547, 548 and/or 549 be preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code;

        e)     directing and ordering that each Defendant, or any immediate or mediate transferee of each Defendant, turnover to Plaintiff the full amount of or value of the Transfers received by such Defendant, or any immediate or mediate transferee of such Defendant, pursuant to section 550 of the Bankruptcy Code;

        f)     awarding judgment against each Defendant and in favor of Plaintiff in an amount equal to:

            (1)     the full amount of the Transfers (and any other avoided transfers discovered after the date of this Complaint) made to each such Defendant;

            (2)     pre-judgment interest at the maximum legal rate running from the time of the Transfers until the date of judgment herein;

            (3)     post-judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full; and

            (4)     attorney's fees and costs incurred by Plaintiff in this suit;

        g)     disallowing any and all claims of each Defendant against the Debtors' estates under section 502(d) and (j) of the Bankruptcy Code;

h)      compelling each Defendant to make restitution to the Plaintiffs in the amount that they were unjustly enriched by the Transfers; and

i)      such other and further relief as this Court may deem necessary and proper under the circumstances.

Dated:  November 6, 2010          **PHILLIPS, GOLDMAN & SPENCE, P.A.**
Wilmington, DE

 /s/ Stephen W. Spence
Stephen W. Spence, Esquire (#2033)
Stephen A. Spence, Esquire (#5392)
1200 North Broom Street
Wilmington, DE 19806
Telephone: 302.655.4200
Facsimile:  302.655.4210
sws@pgslaw.com
sas@pgslaw.com

        -and-

**MITNICK & MALZBERG, P.C.**
Steven J. Mitnick, Esquire
P. O. Box 429
Frenchtown, NJ  08825
Telephone: 908.996.3716
Facsimile:  908.996-7743
SMitnick@mmpclawfirm.com

*Co-Counsel to James R. Zazzali, as Litigation Trustee for*
*the DBSI Estate Litigation Trust*

# Exhibit A

| Transferor/Payor | Defendant Name | Amount | Check No. | Check / Trans Date |
|---|---|---|---|---|
| DBSI New Hampstead II LLC | DBSI Housing - New Hampstead 2 | -$17,130.23 | 1001 | 6/5/2008 |
| DBSI New Hampstead II LLC | DBSI Housing - New Hampstead 2 | $17,130.23 | 1004 | 6/5/2008 |
| DBSI New Hampstead II LLC | DBSI Housing - New Hampstead 2 | $17,130.23 | 1001 | 4/15/2008 |
| | **Defendant Total** | $17,130.23 | | |